## NATIONAL LABOR RELATIONS BOARD v. ACME MATTRESS CO., Inc.

### No. 10441.

United States Court of Appeals
Seventh Circuit.

Nov. 7, 1951.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Dominick L. Manoli, and A. Norman Somers, Asst. Gen. Counsel, Gerald F. Krassa, Washington, D. C., National Labor Relations Board.

Isadore Katz, David Jaffe, New York City, for respondent.

Before KERNER, FINNEGAN and LINDLEY, Circuit Judges.

FINNEGAN, Circuit Judge.

This is a petition by the National Labor Relations Board for the enforcement of an order entered on October 18, 1950, against respondents, Acme Mattress Company, Inc., Textile Workers Union of America, CIO, and Local 169, Textile Workers Union of America, CIO.

It appears that as a consequence of charges filed by one Floyd A. Littleton, the general counsel of the National Labor Relations Board, through the regional director for the ninth region, on June 27, 1949, filed its consolidated complaint against the above-named respondents. Said complaint charged that Acme Mattress Company, Inc., the so-called "Company" respondent, had been and was engaged in unfair labor practices affecting commerce within the meaning of Sec. 8(a) (1) and (3), and Sec. 2(6)

and (7) of the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U.S.C.A. §§ 158(a) (1, 3), 152(6, 7), 157; that Textile Workers Union of America, CIO, referred to as respondent "International," and Local 169 of Textile Workers Union of America, CIO, "Local" respondent had engaged and were engaged in unfair labor practices affecting commerce within the meaning of Sec. 8(b) (1) (A) and (2), and Sec. 2(6) and (7) of said Act, 29 U.S.C.A. §§ 158(b) (1) (A), (2), 152(6), 157.

In reference to the unfair labor practices the complaint charged: (a) that by entering into a bargaining agreement with the said International and Local respondents requiring as a condition of employment membership in Local 169, and by thereafter discharging Littleton for reasons other than his failure to pay required dues and initiation fees uniformly required of members of said Local 169, the respondent company was engaging in unfair labor practices within the meaning of said Sec. 8(a) (1) and (3) of the Act; and (b) that by entering into the above-mentioned union shop agreement with the Company, and by thereafter causing the Company to discharge Littleton for reasons other than his failure to pay uniformly required dues and initiation fees, the Union respondents, International and Local, engaged in unfair labor practices within the meaning of Sec. 8(b) (1) (A) and (2) of the said Act.

The Union respondents, International and Local filed a joint answer in which they admitted the allegation of the complaint in regard to their status as labor organizations; admitted that they had entered into a collective bargaining agreement with the Company respondent, requiring membership in Local 169 as a condition of employment, but denying the commission of the unfair labor practices. The Company respondent also answered denying generally each and every allegation of the complaint.

On April 13, 1950, the trial examiner, to whom the proceedings were referred, issued his intermediate report, finding that the respondents had engaged and were engaging in certain unfair labor practices and recommending that they cease and desist therefrom, and also recommending that said respondents take certain affirmative action declared to be proper to effectuate the policies of the Act. The intermediate report was excepted to by all respondents as well as by the general counsel.

The Board considered the report of the trial examiner, the exceptions thereto, and the briefs and arguments filed in support of such exceptions and generally adopted the findings, conclusions and recommendations of the trial examiner, except in so far as they might be inconsistent with its decision and order.

As part of the relief awarded Littleton, the Board ordered that: "The respondents, Acme Mattress Company, Inc., Indianapolis, Indiana, its officers, agents, successors, and assigns, and Textile Workers Union of America, CIO, and Local 169, Textile Workers Union of America, CIO, their officers, agents, representatives, successors, and assigns, shall jointly and severally make whole Floyd A. Littleton for any loss of pay he may have suffered because of the discrimination against him, during the period from September 14, 1948, to and including August 9, 1949."

The decision and order of the Board which the petition herein seeks to have enforced are reported in 91 N.L.R.B. 1010.

In its brief and argument the Board states that during the hearing before the trial examiner, the respondent Company was actively engaged in the business of manufacturing mattresses and sofa beds. After the hearings had been completed, the Company was adjudicated a bankrupt in the United States District Court for the Southern District of Indiana, Indianapolis Division. The Company's Trustee in Bankruptcy filed exceptions to the report of the trial examiner and participated in the proceedings before the Board. He was informed of his right to partake in these proceedings, but has not chosen to do so. It is said in the argument that he is not now operating the business of the Company. As a result the petition of the National Labor Board for enforcement of its order is opposed in this court only by the respondents representing labor, that is by Textile Workers Union of America, CIO, and the Local Union 169 affiliate of that organization.

From our consideration of this record, we find, as did the trial examiner and the National Labor Relations Board, that the following facts appear from substantial evidence.

Since 1941, the International and Local Union 169 have entered into a succession of collective bargaining agreements with the respondent, Acme Mattress Company. The last of this series of contracts ran from July 31, 1946 to July 31, 1948. It contained a union shop proviso.

One Ralph Cline negotiated and signed this last agreement as "National representative" of the Textile Workers Union of America, CIO, and terminated it with a 60-day notice in accordance with the provisions of the agreement.

Following the expiration of the July 31, 1948 agreement, negotiations for a new contract were carried on intermittently between the representatives of the Company and the representatives of the International and Local Unions involved. As a result of these negotiations, a new collective bargaining agreement was signed on September 14, 1948.

While such negotiations were pending, on about September 10, 1948, the parties had reached agreement on nearly all terms of the new contract except wage increases. The Company made no objection to the inclusion of the union shop clause in the projected contract, despite the fact that neither unions had ever been certified by the Board, as a result of a Board conducted election held pursuant to Sec. 9(e) (1) of the Act, in order to determine whether the majority of the employees in an appropriate unit desired to authorize such labor organization to make an agreement with the employer of such employees regarding membership in such organization as a condition of employment in such unit.

On the matter of wage increases, it appears that Ralph Cline reported that the Company had offered only a three cent increase, and for that reason Cline ordered a strike on the succeeding Monday, September 13. The report of Cline was communicated to Floyd Littleton, who was one of the negotiating committee appointed by Local 169. Littleton shortly thereafter met Stanley B. Smith, vice-president and superintendent of the Company, who was conducting negotiations on its behalf, and rebuked him for offering a niggardly three cent increase. He was assured by Smith that the increase offered had been a five cent increase. Littleton communicated this information to his Union associates and personally expressed dissatisfaction and resentment at the conduct of the representative of the International Union, and with the International itself.

On the morning of September 14, 1948, when the negotiators met, Cline, who acted as spokesman for the Union groups, said to Smith:

"I suppose you notice you are minus old buddy (meaning Littleton). He has been replaced by David Coop and is no longer on the committee and when the negotiations are settled will no longer be an (employee) of the Company.

"Before this contract is signed you will have to get rid of Floyd Littleton."

Smith objected and wished to consult with Littleton, who said he did not want to cause indirectly the prolonging of the strike and proposed that if Smith would permit him to return to work after the contract was signed and the strikers returned, he would himself endeavor to work out a satisfactory solution.

Smith returned to the conference and the contract was signed, Cline executing it as "National Representative" of the International.

One hour thereafter the strike ended and the workers returned. Littleton was discharged. The report of unemployment given by the Company to Littleton for the Indiana Employment Security Division, dated September 15, 1948, states: "Business agent of Textile Workers Union, Local 169, refused to sign labor contract unless company discharged this man."

The record shows that Littleton's current membership dues were paid at this time. Nothing further occurred until August 4, 1949, the last day of hearing before the trial examiner; the respondent unions then stated: "for the record—that they have no objection, and will not interpose objection

to the employment of Floyd Littleton by the Acme Company, and this offer is made in good faith, and among other reasons, to toll any possible back pay award that may be rendered in this case."

On behalf of the Union it is urged: That the Board's findings with respect to liability of the Unions for Littleton's discharge by Cline's procurement is wholly without support in the record, and that all other questions in the case are moot.

The Labor Management Relations Act of 1947, states, Sec. 1(b) of the Act, 29 U.S.C.A. § 141(b) : "It is the purpose and policy of the Act * * * to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, *to protect the rights of individual employees in their relation with labor organizations* * * * to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare".

Section 8(b) of the Act contains matter that is entirely new, when contrasted with the contents of the National Labor Relations Act, the so-called "Wagner Act." It specifies and to some extent defines unfair labor practices by labor organizations in six numbered sections, the fourth of which contains four subsections. It is especially worthy of note that a labor organization is made responsible for the acts of its agents.

As the editor of the annotation in 173 A.L.R. 1401—"The Taft-Hartley Act and its effect on the Wagner Act:" says on page 1423, "It would seem that the same rules apply here as in the case of an employer. In other words, a union is responsible for what people say and do when it is within the actual or apparent scope of their authority * * *. As stated in the Senate Labor Committee Report: The term 'agent' is intended to include all union officials acting in their capacity as union representatives, and is not limited to those officials who have been expressly authorized to commit the act which is alleged to constitute an unfair labor practice."

The record in the case at bar shows that for a number of years Cline had participated in negotiations with the Company and had executed contracts with it on behalf of the International as its "National Representative." He had been the only representative of the International to execute such contracts. In 1948, the International authorized him to give notice terminating the existing agreement with the Company and to negotiate the terms of a successor agreement. Although Cline testified that he was not authorized to sign a contract without first obtaining the approval of the International, the latter, under the circumstances disclosed here, held him out as its negotiator. No limitation was communicated to the Company with respect to Cline's apparent authority to impart to the Company the terms and conditions upon which the International would execute the contract and terminate the strike. In demanding and procuring Littleton's discharge as the price for signing the September 14, 1948 agreement, and calling off the strike Cline was acting within the scope of that authority. Local 169 had empowered its negotiating committee to set the terms and conditions upon which it would execute a collective bargaining agreement with the Company and terminate the strike, and to negotiate for and execute such an agreement. The negotiating committee in the course of the negotiations permitted Cline to act, at least in part, as its spokesman. At no time during the negotiations did the committee disassociate itself from Cline's demand that dismissal of Littleton was a prerequisite to the signing of the contract and termination of the strike. Its failure to do so signified only that it was concurring in the demand for Littleton's dismissal and, together with Cline, was insisting upon Littleton's discharge as the price for consummating a contract and calling off the strike. Its action in this respect clearly fell within its apparent authority, and Local 169 is therefore answerable for it, regardless of the circumstance that it may not have specifically authorized the committee to exact such a condition for terminating the strike or consummating a contract.

528

We agree with the finding of the Board that under the facts and circumstances disclosed by this record, both respondent unions, International and Local, are responsible for the acts which caused Littleton's discharge.

This court held in Union Starch & Refining Co. v. National Labor Relations Board, 7 Cir., 186 F.2d 1008, that where the Board found that both employer and union were responsible for loss suffered by a discharged employee, the Board properly held the employer and the union jointly and severally liable for back pay under the Act. National Labor Relations Act, Sec. 10(c) as amended by Labor Management Relations Act of 1947, 29 U.S.C.A. § 160(c).

We are not impressed with the contention that enforcement of the Board's order should be denied at this time because the "Company" has been judicially declared insolvent and is not now actively engaged in business. A proceeding can not be said to be moot when the order or decree sought therein is necessary to carry into effective execution the judgment of an agency awarding compensation for the infringement of a person's statutory rights. This is a statutory proceeding. The Labor Management Relations Act of 1947, under the terms of which it was instituted, has for its purpose and policy the declaration and protection of the rights of employees and employers in their relations affecting commerce. The Board created to administer the Act has properly directed that the respondent Company and the respondent Unions—International and Local—shall jointly and severally make the aggrieved employee, Littleton, whole for any loss of pay caused him from September 14, 1948, the date of his discharge, to August 9, 1949, a date five days after the union respondents gave notice that they had no objection to the reinstatement of Littleton.

Enforcement is sought in this court so that the order of the Board may be carried into execution. The mere fact that insolvency of the Company may make it impracticable or impossible for that respondent to discharge any part of the obligations imposed upon it, is no reason for delaying the enforcement of the order. It may be safely assumed that the Board will make no attempt to enforce directions with regard to posting notices, offering employment, etc., which existing conditions make it impossible for the Company to perform.

The order of the National Labor Relations Board will be enforced.