319 F.2d 655
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
WESTERN STATES REGIONAL COUNCIL NO. 3, INTERNATIONAL
WOODWORKERS OF AMERICA, AFL-CIO and International
Woodworkers of America, Local 3-101,
AFL-CIO, Respondents.
 No. 18181.
 United States Court of Appeals Ninth Circuit.
 June 19, 1963.
 
 Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, Ira M. Lechner and Melvin Pollack, Attys., N.L.R.B., Washington, D.C., for petitioner.
 A. C. Roll, Roseburg, Or., Walthew, Warner & Keefe, Thomas P. Keefe and John Walthew, Seattle, Wash., for respondents.
 
 
 1
 Before HAMLEY and MERRILL, Circuit Judges, and SWEIGERT, District judge.
 
 
 2
 SWEIGERT, District Judge.
 
 
 3
 This case is before the Court upon a petition of the National Labor Relations Board, Pursuant to Sec. 10(e) of the National Labor Relations Act, 29 U.S.C. 151 et seq., for enforcement of its order issued May 25, 1962, against respondents, International Woodworkers of America, Local 3-101 (hereinafter referred to as the Local) and Western States Regional Council No. 3, International Woodworkers of America, AFL-CIO (hereinafter referred to as the Regional Council) requiring respondents to cease and desist from certain activities found by the Board to be in violation of the secondary boycott provision of the Act, Sec. 8(b)(4)(i) and (ii)(B).
 
 
 4
 Eclipse Lumber Company, a co-partnership, operates a saw mill at Everett, Washington. It had a contract with Priest Logging Inc., under which Priest logged timber and delivered the logs by truck to the Eclipse saw mill premises. The contract provided that Priest would not be paid for its cutting and hauling services until the logs were so delivered. Eclipse employees customarily unloaded the trucks on arrival and handled the logs either by dumping them into water or by placing them on land in piles. This latter operation is called 'cold decking.'
 
 
 5
 On March 16, 1961, pursuant to a collective bargaining agreement between Eclipse and respondent, the Local opened the contract for negotiation, specifying four so-called 'industry issues.' A notice from the Local to Eclipse stated that respondent, Regional Council, had sole authority to represent the Local in all negotiations on the proposed issues and also on all negotiations on any amendments or revisions requested by Eclipse and, further, that any departure from the notice must be in writing over the signature of the Regional Council.
 
 
 6
 In the course of negotiations conducted by one Fadling, Administrator for the Regional Council, Eclipse eventually agreed to accept the four proposed industry terms but only upon condition that the Local agree to Eclipse's proposed modifications of the work assignments of 'boom men'-- a 'local issue'.
 
 
 7
 On August 28th Fadling, after consulting with the Local 3-101 Standing Committee, rejected Eclipse's proposal and on the following day a strike was called against Eclipse. Its employee members of the Local went of their jobs and pickets were placed at the entrance to the saw mill.
 
 
 8
 Eclipse, unable to continue its normal operations because of the strike, modified its contract with Priest to authorize Priest to deliver logs at the Bayside Log Dump, a commercial log dump which accepts logs from anyone for storing, sorting and fashioning logs into rafts.
 
 
 9
 Eclipse then arranged with Bayside for the storage of the Eclipse logs that would be delivered there by Priest for Eclipse's account and at Eclipse's expense. There is evidence to the effect that at least one purpose of these arrangements was to enable Priest to make its deliveries somewhere so that it might claim payment for its services and the Board so found.
 
 
 10
 On September 13th Priest trucks were routed to Bayside. After a few truck loads had been unloaded the Local placed pickets at Bayside with signs calling attention to the strike at Eclipse and charging unfairness to the Local Union. Bayside employees refused to cross the picket line and stopped work.
 
 
 11
 Picketing continued to September 19th when Bayside Dump entered into an arrangement with the Local for removal of the picket line from Bayside upon condition, however, that Bayside would not handle any more Eclipse logs from Priest.
 
 
 12
 On September 22nd, a complaint was filed with NLRB charging respondents with an unfair labor practice. The Board found that by means of picketing, respondent Local had induced and encouraged employees of Bayside and Priest to engage in a concerted refusal to handle Eclipse logs and, further, had threatened, coerced and restrained Bayside and Priest, with an object of forcing or requiring Priest and Bayside to cease doing business with Eclipse in violation of NLRA, Sec. 8(b)(4)(i) and (ii)(B), rejecting a Trial Examiner's conclusion that Bayside was an ally of Eclipse and that the union appeals to its employees and to the employees of Priest were permissible.
 
 
 13
 The Board also concluded that respondent Regional Council, by virtue of the role played by its Administrator Fadling in these activities, was jointly liable with the Local for the violations.
 
 
 14
 Two questions are presented on this appeal:
 
 
 15
 1) Was the work performed at Bayside that of an ally of Eclipse?
 
 
 16
 2) Was respondent Regional Council, properly held to be jointly responsible for any violation of the Act?
 
 THE ALLY ISSUE
 
 17
 Bayside should be held to be an ally of Eclipse only if Bayside knowingly performed work which, but for the strike of Eclipse employees, would have been done by employees of Eclipse, so that the economic effect upon the striking Eclipse employees would be in effect the same as if Eclipse had hired strike breakers to work upon its premises. (See: Douds v. Metropolitan Federation of Architects etc., 75 F.Supp. 672 (S.D.N.Y.1948); NLRB v. Business Machines etc., 228 F.2d 553 (2d Cir.1955); International Dye Sinkers, 120 N.L.R.B. 1227 (1958); cf. NLRB v. Amalgamated Lithographers, 309 F.2d 31 (9th Cir.1962).)
 
 
 18
 The mere fact that Priest, unloading logs at Bayside, and Bayside storing logs on its premises, were performing services for Eclipse would not be sufficient to brand either Priest or Bayside as allies of Eclipse. It often happens that independent contractors are producing raw materials, parts or supplies intended for delivery to a primary employer when a strike of the latter's employees occurs.
 
 
 19
 To hold that such fact, in itself, removes the independent contractors from the protection of Section 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act would be to countenance the very secondary boycott which that section was designed to prohibit.
 
 
 20
 The record in the pending case presents the question whether independent contractors, who under arrangements made by a struck primary employer perform services incident to the storage of the raw materials, parts or supplies pending a strike for the primary employer's account and at its expense, thereby become allies of the primary employer.
 
 
 21
 Such services in a sense tend to help the primary employer and to diminish the economic impact of a strike. Nevertheless, those services should not be held to remove the independent contractors from the protection of the secondary boycott provisions of the NLRA unless the services supplant the work of the striking employees with the purpose and effect of enabling the primary employer to carry on its usual operations during and notwithstanding the strike.
 
 
 22
 In the pending case the record shows that the work of unloading logs delivered by Priest, if delivered by Priest at the premises of Eclipse, would have been performed by Eclipse employees as an incident to Eclipse business operations. However, the record also shows, and the Board found, that the unloading work performed by Bayside employees incident to Bayside's storage of the logs pending the strike did not supplant or take away work from Eclipse striking employees because the logs were distined for later delivery to Eclipse upon resumption of its operations at which time the normal unloading work of the striking Eclipse employees would still remain to be performed.
 
 
 23
 The record further shows, and the Board found that Eclipse is in the business of manufacturing logs by saw mill into limber while Bayside is in the business only of commercial storage and rafting of logs-- and that no part of the storage service furnished by Bayside aided Eclipse either directly or indirectly in carrying on its manufacturing activity. Under these circumstances it must be held that the unloading work at Bayside involved a duplication rather than a supplanting of the work of Eclipse employees. It was, therefore, not struck work within the meaning of the ally doctrine.
 
 
 24
 Limitations upon the ally doctrine have been recognized and applied under comparable circumstances in McLeod for and on Behalf of NLRB v. United Auto Workers, Local 365, 200 F.Supp. 778, 781 (E.D.N.Y.1962), aff'd 299 F.2d 654 (2d Cir.1962); Cf. N.L.R.B. v. Local 810 etc., Teamsters, 299 F.2d 636 (2d Cir.1962).
 
 
 25
 Respondents contend, however, that there is evidence in the pending case that Eclipse, although primarily a saw mill operator, maintains sizable tracts adjacent to its saw mill for the purpose of stockpiling logs by cold decking them in order to obviate the effect of seasonal weather conditions which prevent delivery of logs from the timber lands. The purpose of this stockpiling by cold decking is to keep the mill in year round operation.
 
 
 26
 Thus, respondents argue, Eclipse by arranging for the storage of logs in the Everett area at the nearby premises of Bayside avoids to that extent the economic effects of the strike and places the union at a considerable disadvantage in respect to negotiations.
 
 
 27
 However, such a result inevitably follows whenever a struck primary employer arranges for temporary storage of raw materials, parts or supplies pending a strike. If that were not done, delay after cessation of the strike in obtaining the raw materials, parts and supplies essential for most manufacturing and commercial operations would prevent resumption of operation and cause post strike losses, not only to the employer, but to employees as well.
 
 
 28
 The evidence does not show that Eclipse's stockpiling of logs by cold decking was so essential to its saw mill operation as to ernder Eclipse in effect in the business of storing logs for itself or for others. Nor does the evidence show that temporary storage of logs at Bayside was in effect a device for the continuance of usual Eclipse operations.
 
 
 29
 The findings of the Board are contrary to respondent's contention and they are supported by substantial evidence.
 
 
 30
 At oral argument respondents made the further point that logs unloaded at Bayside were stored in the water in such a way that they could be rafted for a distance of about nine miles directly to the Eclipse mill, arguing that this would obviate the need for further unloading of trucks by Eclipse employees upon redelivery to the Bayside premises.
 
 
 31
 An examination of the record discloses only a general statement that Bayside expected to ultimately raft the logs on order of Eclipse, but that no such request had ever been received from Eclipse.
 
 
 32
 There is no substantial evidence that such was the intended plan of Eclipse or that the arrangement was for anything more than storage purposes pending the strike and the Board made no finding to the contrary. Further, the evidence is such as to support the inference that in any event the eventual redelivery of the logs from Bayside to Eclipse premises will involve further work incident to their reception there by Bayside employees.
 
 
 33
 The Court concludes, therefore, that Bayside was not an ally of Eclipse and that the activities of the Local were in violation of NLRA, Sec. 8(4)(i) and (ii)(B).
 
 
 34
 THE JOINT RESPONSIBILITY OF THE REGIONAL COUNCIL
 
 
 35
 It is admitted that Fadling acted as agent for both the Local and the Regional Council during the prestrike negotiations. Respondent, Regional Council contends, however, that Fadling's authority to act for it was limited to the negotiation and settlement of the so-called 'industry issues' only and that once those terms were agreed to by Eclipse any further participation by Fadling was as a spokesman only for the Local at its request.
 
 
 36
 However, the notice to Eclipse authorized Fadling to act for the Regional Council, not only on the proposed industry issues, but also on any amendments or revisions requested by Eclipse. Eclipse did request amendments and revisions as a condition of its agreement to the industry issues. Refusal of the Local to agree to these conditions, involving so-called local issues, precipitated the strike. Fadling voiced the refusal of the Local to accede to such conditions, and continued during the strike to intervene in the secondary picketing dispute at Bayside by setting forth to Bayside the terms upon which the pickets at its premises would be withdrawn.
 
 
 37
 Whether Fadling may have gone beyond the actual intent of the instructions of his principal, the Regional Council, does not necessarily detract from his authority to bind the Regional Council. See NLRA, Sec. 2(13), 29 U.S.C. 152. His authority under the circumstances was made to appear real to the parties with whom he dealt and to the parties affected by his actions. Furthermore, neither Fadling nor the Regional Council gave any notice that his role in a continuing course of closely related negotiations had in fact changed nor was any timely disavowal of his participation made by the Regional Council. Further, settlement of the local issues was an essential condition to Fadling's ability to bring the industry issues to a final, successful conclusion.
 
 
 38
 We conclude, therefore, that the evidence supports a finding that Fadling's participation in the secondary picketing phase of the strike was within the course and scope of his employment by the Regional Council and in any event within the scope of his apparent authority. Cf. NLRB v. Cement Masons, Local 555, 225 F.2d 168 (9th Cir.1955); NLRB v. Acme Mattress Co., 192 F.2d 524 (7th Cir.1951).
 
 
 39
 For the foregoing reasons, the petition of the Board for the enforcement of its order of May 25, 1962 is granted.