743 F.2d 734
 117 L.R.R.M. (BNA) 2502, 101 Lab.Cas. P 11,200
 GENERAL TEAMSTERS LOCAL 959, STATE OF ALASKA, Petitioner,
v.
NATIONAL LABOR REVIEW BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Cross-Petitioner,
v.
GENERAL TEAMSTERS LOCAL 959, STATE OF ALASKA, Cross-Respondent.
 Nos. 83-7767, 83-7869.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 10, 1984.
Decided Sept. 25, 1984.
 
 James A. Witt, Anchorage, Alaska, for petitioner.
 Howard E. Perlstein, Susan Williams, N.L.R.B., Washington, D.C., for respondent.
 Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Before FLETCHER and FARRIS, Circuit Judges, and CRAIG,* District Judge.
 PER CURIAM:
 
 
 1
 The question on appeal is whether the union's conduct fits within one of the judicially recognized exceptions to the ban against secondary boycotts. The NLRB found against the union and issued a cease and desist order. We affirm.
 
 Facts
 
 2
 The Odom Corporation, a wholesale distributor of dry goods and beverages, operates two warehouses in Anchorage, Alaska under the name of Anchorage Cold Storage. Before the strike 85% of Anchorage Cold Storage's inventory was shipped from "the lower 48" to Anchorage on ocean-going vessels. The company employed one worker full-time and three part-time to move goods from the Anchorage city dock to its warehouses. These employees belonged to a bargaining unit represented by the appellant, Teamsters Local 959. The remaining 15% of the company's inventory was shipped on the Alaska Railroad's "hydrotrain," a barge bearing railroad boxcars. The primary item shipped by the company on the hydrotrain from 1974 to 1981 was beer. Only beer was shipped in the two years preceding the strike.
 
 
 3
 A dispute between Anchorage Cold Storage and its employees ripened into a strike on June 29, 1981. Local 959 picketed the company's two ocean-going carriers, which stopped taking shipments. The company arranged for other ocean-going vessels, including a tug owned by VEDCO, to carry its goods to Seward, Alaska, where the goods were transferred to railroad cars and hauled 120 miles overland to Anchorage. Anchorage Cold Storage employees transported the goods within Anchorage from the Alaska Railroad yard to the company's warehouses. The distances to the warehouses from the yard and from the Anchorage city dock are roughly equivalent. The company also resumed shipping items other than beer on the hydrotrain.
 
 
 4
 Local 959 picketed the alternate carriers doing business with the company. The union set up picket lines to discourage the unloading of Anchorage Cold Storage's cargo at Seward and engaged in waterborne picketing around VEDCO's tug. It picketed the Alaska Railroad's facilities in Anchorage. Charges were filed against the union, and the NLRB issued a complaint alleging illegal secondary boycotts. A hearing was held in March, 1982. On September 29, 1982, the administrative law judge issued a decision and a cease and desist order forbidding the secondary boycotts. He also required Local 959 to post a notice describing its willingness to obey the order. The NLRB summarily adopted the ALJ's decision and order on May 23, 1983. General Teamsters Local 959. 266 NLRB No. 134. Local 959 appealed and the NLRB cross-petitioned for enforcement of its order.
 
 Standard of Review
 
 5
 Twenty-nine U.S.C. Secs. 160(e) and (f) provide that factual findings of the NLRB are conclusive if "supported by substantial evidence on the record considered as a whole." See International Association of Bridge, Structural and Ornamental Iron Workers, Local No. 433 v. NLRB, 598 F.2d 1154, 1159 (9th Cir.1979). See also NLRB v. Denver Building and Construction Trades Council, 341 U.S. 675, 691-2, 71 S.Ct. 943, 952-3, 95 L.Ed. 1284 (1951), where the Supreme Court stated: "Not only are the findings of the Board conclusive with respect to questions of fact ... but the Board's interpretation of the Act and the Board's application of it in doubtful situations are entitled to weight."
 
 The Ally Doctrine
 
 6
 The term "secondary boycott" refers to pressure brought to bear by a union against parties other than the employer with whom the union has the original or "primary" dispute. Though it does not refer to secondary boycotts by name, 29 U.S.C. Sec. 158(b)(4)(B) makes it an unfair labor practice for a labor union to "forc[e] or require[e] any person ... to cease doing business with any other person," provided that this prohibition does not apply to "any primary strike or primary picketing." While the statutory language sweeps broadly,[1] courts have held that employers who ally themselves with another employer involved in a labor dispute lose their protection against secondary boycotts. The word "ally" has a narrow, specialized meaning, referring to an employer who "knowingly does work which would otherwise be done by the striking employees of the primary employer." NLRB v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, 228 F.2d 553, 559 (2d Cir.1955), cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956). The ally doctrine was formulated in Douds v. Metropolitan Federation of Architects, Engineers, Chemists & Technicians, Local 231, 75 F.Supp. 672 (S.D.N.Y.1948). There the primary employer, Ebasco, sought to cope with a strike by farming out work to Project Engineering. The question before the court was whether the union had violated the recently enacted Taft-Hartley Act by picketing Project Engineering. The court upheld the legality of the secondary picketing:
 
 
 7
 The evidence is abundant that Project's employees did work, which, but for the strike of Ebasco's employees, would have been done by Ebasco. The economic effect upon Ebasco's employees was precisely that which would flow from Ebasco's hiring strikebreakers to work on its own premises.... In encouraging a strike at Project the union was not extending its activity to a front remote from the immediate dispute but to one intimately and indeed inextricably united to it.
 
 
 8
 Id. at 677. The Supreme Court has endorsed the ally doctrine without yet having been called upon to apply it. National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 627, 87 S.Ct. 1250, 1259, 18 L.Ed.2d 357 (1967). We have considered the doctrine twice, briefly in NLRB v. Amalgamated Lithographers of America, 309 F.2d 31, 36-38 (9th Cir.1962), cert. denied, 372 U.S. 943, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963), and more fully in NLRB v. Western States Regional Council No. 3, International Woodworkers of America, 319 F.2d 655 (9th Cir.1963). In the latter case Eclipse Lumber Company, embroiled in a dispute with the Woodworkers, arranged to have the Bayside Log Dump receive deliveries from Eclipse's supplier. We held that the union could not picket Bayside as an ally of Eclipse. The temporary storage of logs at Bayside did not displace unloading work normally done by Eclipse employees, we said, because the logs would eventually have to be unloaded at the Eclipse mill. Id. at 657-58.
 
 
 9
 The union contends that the Alaska Railroad became an ally of Anchorage Cold Storage because it did work formerly done by the company's employees. By carrying goods overland from Seward to Anchorage, the Alaska Railroad is said to have displaced the work done by the one full-time and three part-time employees who drove vehicles bearing containers from the Anchorage city dock to the company's warehouses. The union contends that before the strike its bargaining unit did all the overland carrying except for that associated with the hydrotrain, and that the railroad infringed on this activity. We understand but reject the argument. While the bargaining unit's and the railroad's routes were both overland, it does not follow that the railroad displaced work done by the bargaining unit. The railroad's Seward-to-Anchorage run was a partial replacement for the ocean-going carriers who ceased doing business with the company because of the strike. Members of the bargaining unit who had handled local transportation within Anchorage could have continued to do so after the railroad began carrying goods overland. We recognize that the union members would have had to pick up goods at the Alaska Railroad terminal, whereas before the strike they picked up goods at the Anchorage city dock. But the terminal and dock are roughly the same distance from the company's warehouses. The essential character of the bargaining unit work--local, intra-Anchorage transportation--was not affected when Anchorage Cold Storage began using the railroad as a long-distance carrier.
 
 
 10
 The union also argues that the railroad became an ally of Anchorage Cold Storage by changing its two-year practice of carrying only beer on the hydrotrain. The question is whether the railroad displaced bargaining unit work by carrying non-beer items. The union seems to be claiming that it had a right to have all goods other than beer pass through its hands on the way to the company's warehouses. While it is true that union members had handled all non-beer deliveries to the warehouses for two years before the strike, this is merely an accidental feature of the bargaining unit work and not a defining characteristic. Non-beer items had been shipped on the hydrotrain prior to two years before the strike. The company's subsequent practice of shipping only beer on the hydrotrain, as far as the record shows, was a matter of convenience or economic advantage and not a concession sought by the union. The administrative law judge found that "in normal times" the company would not have had to consult with the union before changing the mix of goods sent on the hydrotrain. Also, the record contains no evidence that the union members who transported goods within Anchorage concerned themselves with the nature of the contents of the containers on their trucks or vans.
 
 
 11
 The administrative law judge properly rejected the union's contention that delivering goods other than beer to the company's warehouses was necessarily bargaining unit work. The Alaska Railroad did not displace union work by accepting goods other than beer.The Single Enterprise Doctrine
 
 
 12
 We now consider the legality of the union's waterborne picketing of VEDCO's tug. The union does not argue that VEDCO did work formerly done by Anchorage Cold Storage employees. Instead, it contends that Anchorage and VEDCO are a single business entity, so that a strike directed at one may be pursued against the other. The "single enterprise" doctrine is regarded by some courts and commentators as a branch of the ally doctrine, see Teamsters, Chauffeurs, Warehousemen, and Helpers, Local Union No. 560 (Curtin Matheson Scientific), 248 N.L.R.B. No. 156, 1980 N.L.R.B. (CCH) p 16,949. See also Annot., 13 A.L.R.Fed. 466, 471 (1972). Whether we regard it as a branch or an independent theory, the question in all single enterprise cases is whether two nominally distinct businesses will be treated as one, thereby making inapplicable the ban on secondary boycotts. Courts uniformly agree that the answer depends on the details of each business arrangement and cannot be determined by applying per se rules or labels like "agent" or "independent contractor." The single Ninth Circuit case to consider whether a shipper and carrier are a single enterprise is Haughton v. Columbia River District Council No. 5, International Woodworkers of America, 294 F.2d 766, 767 (9th Cir.1961). Elk Creek Logging Co. leased trucks and hired employees, represented by the union, to drive them. In 1953 Elk abandoned its agreement with the union drivers and began subcontracting its log hauling to Carignan. The union struck Elk, which sued the union for, among other things, illegally boycotting Carignan. We affirmed the district court's finding for the union, but rejected the union's argument that Carignan and Elk were a vertically integrated ("straight line") single enterprise. In so holding we are consistent with a majority of decisions on the issue. See NLRB v. Chauffeurs, Teamsters, Warehousemen, & Helpers Local Union No. 135, 212 F.2d 216, 217-19 (7th Cir.1954) and the cases collected at Annot., 13 A.L.R.Fed. 466, 587-591 (1972). See also, for a thorough discussion of the question, Kinty v. United Mine Workers of America, 544 F.2d 706, 716-720 (4th Cir.1976), cert. denied, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977) (issue should not have been taken from the jury); cf. Local No. 24, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. NLRB, 266 F.2d 675 (D.C.Cir.1959) (single enterprise found).
 
 
 13
 The lesson of the shipper-carrier cases is that two entities will be deemed a single enterprise only when they are so integrated that one would say they are actually one business. VEDCO and Anchorage Cold Storage do not satisfy this test. The union implies that VEDCO carries goods only for Anchorage Cold Storage, by stating, "Since VEDCO purchased the POLAR MERCHANT [tug] in September of 1981, it has towed no other barges besides ACS's." But this statement suggests that VEDCO and Anchorage are a single enterprise only if one is unaware that (1) VEDCO leased other tugs with which it served other shippers during the period of the dispute, and (2) the period during which we know that the Polar Merchant hauled exclusively for Anchorage was brief (September 1981 to March, 1982, when the hearing was held in this case); the record says nothing about what has happened since. The union also notes that Anchorage Cold Storage had a bareboat charter on the barge Sea Otter. The Sea Otter was not owned by VEDCO but by Pacific Northwest. The union's implicit argument seems to be that it was entitled to picket the barge because of Anchorage's control over it, and could therefore picket VEDCO's tug. But the barge was unmanned. Even if Anchorage owned the barge outright, the union would not therefore be entitled to picket VEDCO. To hold otherwise would be to permit a union to picket any shipper who carried cargo for an employer with whom the union had a primary dispute.
 
 
 14
 VEDCO and Anchorage Cold Storage were engaged in an ordinary arms-length shipper-carrier relationship, without the integration necessary to satisfy the single enterprise doctrine. Cf. Local No. 24 v. NLRB, supra, 266 F.2d 675.
 
 Conclusion
 
 15
 Local 959's picketing of the Alaska Railroad is not justified under the ally doctrine. Its picketing of VEDCO is not permissible under the single enterprise doctrine. The NLRB's order is enforced and its decision
 
 
 16
 AFFIRMED.
 
 
 
 *
 The Honorable Walter E. Craig, Senior United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 It shall be an unfair labor practice for a labor organization or its agents--
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--...
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; ...