DOUDS v. METROPOLITAN FEDERA-
TION OF ARCHITECTS, ENGINEERS,
CHEMISTS & TECHNICIANS, LOCAL
231 et al.

Civ. 44–215.

District Court, S. D. New York.
Jan. 26, 1948.

Reeves R. Hilton, of Washington, D. C., Jack Davis, of New York City, and Wal-

ter M. Moldawer, of Philadelphia, Pa., for petitioner.

Neuburger, Shapiro, Rabinowitz & Boudin, of New York City, (Leonard B. Boudin, of New York City, of counsel), for respondent.

James L. Moore, of New York City, for Project Eng. Co., charging party.

Witt & Cammer, of New York City, amicus curiae.

White & Case, of New York City, amicus curiae.

McLanahan Merritt & Ingraham, and Walter Gordon Merritt, all of New York City, for Ebasco Services, Inc., amicus curiae.

RIFKIND, District Judge.

This is a petition brought by Charles T. Douds, Regional Director of the Second Region of the National Labor Relations Board to enjoin the respondent, Metropolitan Federation of Architects, Engineers, Chemists and Technicians, Local 231, United Office & Professional Workers of America, C. I. O., from engaging in certain activities alleged to be in violation of Section 8(b) (4) (A) of the National Labor Relations Act, as Amended by § 101 of the Labor Management Relations Act of 1947, Public Law 101, 80th Congress, popularly known as the Taft-Hartley Act, 29 U.S.C.A. § 158(b) (4) (A). Project Engineering Company, a partnership, is the "charging party," and has asked for, and received permission to intervene.

The relevant portions of the Act are set out in the margin.[1]

The testimony offered by the petitioner, the respondent, and the charging party at the hearings established the following facts:

Ebasco Services, Inc. is a corporation engaged, since 1905, in the business of supplying engineering services, such as planning and designing and drafting plans, for industrial and public utility installations. During the year ending September 1, 1947, the respondent union was the bargaining agent for Ebasco's employees. On that

[1] "Sec. 8. (b) It shall be an unfair labor practice for a labor organization or its agents—* * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * * *."

"Sec. 10. (l) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 8 (b) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States (including the District Court of the United States for the District of Columbia) within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: Provided further, That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable and such temporary restraining order shall be effective for no longer than five days and will become void at the expiration of such period. Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: * * *." 29 U.S.C.A. § 160(l).

day the agreement between Ebasco and the union expired. A new agreement was not reached and a strike against Ebasco was commenced on September 5, 1947.

James P. O'Donnell and Guy M. Barbolini in 1946 organized a partnership, styled Project Engineering Company, herein called "Project". Its business is identical with Ebasco's—planning and designing and drafting plans for industrial installations although they seem to have specialized in chemical and petroleum plants. The partnership had an inception completely independent of Ebasco or its influence. There is no common ownership of any kind. It was through Project's solicitations that Ebasco first employed the partnership. An open contract dated December 19, 1946 marked the beginning of their business relations.[2]

Prior to August, 1946, Ebasco never subcontracted any of its work. Subsequent to that date it subcontracted some of its work. At the time the strike was called, part of Ebasco's work had been let out to Project. An appreciable percentage of Project's business for some months antedating the strike consisted of work secured from Ebasco. After the strike had begun, an even greater percentage—about 75%—of its work was Ebasco's. Some work, which had been begun by Ebasco's workers, was transferred, after the commencement of the strike, in an unfinished condition to Project for completion.

In a brochure printed and distributed by Ebasco before the strike to its prospective customers, Ebasco represented itself as having available the services of a number of draftsmen and designers, which included the personnel of Project and of other subcontractors. The contract price of all the work done by Project for Ebasco was computed by adding to the compensation of the men engaged on Ebasco work a factor for overhead and profits. In their business relationship it was the practice of Project to furnish Ebasco with time sheets, showing the number of hours each of the former's employees spent on Ebasco work. Ebasco's statements to its customers contained the time spent by technicians, with no distinction made between the work done by Ebasco employees and subcontractors' employees.

Ebasco supervisory personnel made regular visits to Project to oversee the work on the subcontracts. After the strike was called and the work subcontracted increased, these visits increased in frequency and numbers of personnel involved. Ebasco supervisory personnel, whose subordinates were on strike, continued to supervise their "jobs", at Project's plant, where such work had been transferred. The working hours of Project employees were increased after the commencement of the Ebasco strike.

Delegations representing the respondent union approached the charging party on more than one occasion and asked, among other things, that it refuse to accept work which had come "off the boards" of Ebasco.

---

[2] Following are the relevant portions of the text of the contract:

"Furnish services of your designers and draftsmen commencing December 16, 1946 to work under the direction and supervision of the Purchaser.

"Compensation for services shall be computed by applying a factor of ———— to the actual compensation paid by you to individuals engaged on the Purchaser's work for actual time worked, plus actual overtime premium for time in excess of 40 hours per week.

"In addition you are to be reimbursed by Purchaser at cost to you for out-of-pocket expenses that may be incurred in connection with the work.

"It is understood that the above factors shall include your overhead, profits, vacation and absence allowances and similar items.

"All computations required for the work shall be made in Design Books to be supplied by Purchaser, such books to be turned over to Purchaser upon completion of the work for filing as a part of its job record.

"All employees furnished by the Seller shall at all times be and remain employees of the Seller. Neither Ebasco nor Project Engineering Company shall offer employment to designers or draftsmen in the employ of the other during the period services are being supplied to Purchaser and for 90 days thereafter.

" * * *

"Termination: The Purchaser reserves the right to terminate this order at any time."

On October 28, 1947, respondent union ordered Project picketed and such picketing has continued since that day. The pickets carry signs which denominate Project a scab shop for Ebasco. A number of resignations at Project are attributable to the picketing.

The number of pickets has usually been reasonable and the picketing was ordinarily unaccompanied by violence. However, on a number of occasions, to wit, October 28, November 6 and November 25, there was picketing by 35 men or more. Such occasions were marked by pushing, kicking and blocking the entrance way to the building. Epithets such as "scab," "louse", "rat" and others were hurled at Project employees by the pickets. On those occasions the assistance of the police was requested by Project employees and order was promptly restored. Project continues to do engineering work for Ebasco—the kind of work which Ebasco employees themselves would be doing if they were not striking.

The Taft-Hartley Act has thus far had but little judicial attention. In the only case which has come to my attention in which the Act was applied, Douds v. Local 294, International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America, A. F. of L., D.C., 75 F. Supp. 414, decided December 31, 1947 in the Northern District of New York, the question which I consider crucial in this case was not discussed. No case thus far has reached an appellate court. Even cursory examination of the stated facts and the quoted portions of the Act reveals that the case bristles with questions of constitutional law, statutory construction and practical application. It is necessary in this instance to find the answers to but a few of these.

One of the prohibitions of Section 8(b) (4) (A) of the Act is: "It shall be an unfair labor practice for a labor organization * * * to * * * encourage the employees of any employer to engage in, a strike * * * where an object thereof is * * * requiring * * * any * * * person * * * to cease doing business with any other person."

Is Project "doing business" with Ebasco within the meaning of the Act? The term is not defined in the Act itself. Section 2, 29 U.S.C.A. § 152, contains thirteen definitions, but none of doing business. The term itself has, of course, received a vast amount of judicial construction but always in a context so different that it is pointless to explore that field for help in construing the term in the present context. Nor is it possible to attach legal consequences to all the relationships which the dictionary meaning of the term embraces. So to do would destroy the Act by driving it to absurdity. To give such broad scope to the term would, for instance, reach out to and include the business relation between an employee of the primary employer (Ebasco, in this case) and the primary employer, or the business relationship between a primary employer and a professional supplier of strike-breakers. Certainly it is an object of very many strikes and picket lines to induce a reduction in the struck employer's business by an appeal to customers—"any person"—to cease dealing with the employer. This is one of the most conspicuous weapons employed in many labor disputes. The effect of a strike would be vastly attenuated if its appeals were limited to the employer's conscience. I shall proceed on the assumption, warranted by the history of the Act, that it was not the intent of Congress to ban such activity, although the words of the statute, given their broadest meaning, may seem to reach it. Moreover, such broad construction would probably run afoul of Section 13 of the Act, 29 U.S.C.A. § 163, which reads: "Sec. 13. Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."

To find the limitations to which "doing business" must be confined recourse may be had to the legislative history to discover the mischief which Congress intended to remedy. In describing the "necessity for legislation" the House Committee on Education and Labor reported, Report No. 245, pp. 4-5:

"The employers' plight has likewise not been happy. * * *

"His business on occasions has been virtually brought to a standstill by disputes to which he himself was not a party and in which he himself had no interest."

The Senate Committee on Labor and Public Welfare reported the bill which it in part described thus, Report No. 105, p. 3:

"The major changes which the bill would make in the National Labor Relations Act may be summarized as follows: * * *

"3. It gives employers and individual employees rights to invoke the processes of the Board against unions which engaged in certain enumerated unfair labor practices, including secondary boycotts and jurisdictional strikes, which may result in the Board itself applying for restraining orders in certain cases."

Page 22 of the report goes on to say:

"Under paragraph (A) strikes or boycotts, or attempts to induce or encourage such action, are made violations of the Act if the purpose is to force an employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of another, or to cease doing business with any other person. Thus, it would not be lawful for a union to engage in a strike against employer A for the purpose of forcing that employer to cease doing business with employer B; nor would it be lawful for a union to boycott employer A because employer A uses or otherwise deals in the goods of or does business with employer B (with whom the union has a dispute)."

During the Congressional debates on the Bill, Senator Pepper objected to the provisions relating to the secondary boycott and stated an illustration in which he thought it would be unjust to apply them. Senator Taft, in reply, said: "I do not quite understand the case which the Senator has put. This provision makes it unlawful to resort to a secondary, boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees." (April 29, 1947, p. 4323 of the Congressional Record, Vol. 93.)

■ Examination of these expositions of Congressional purpose indicates that the provision was understood to outlaw what was theretofore known as a secondary boycott. It is to the history of the secondary boycott, therefore, that attention should be directed and it is in the light of that history that the term "doing business" should be evaluated. See Hellerstein, Secondary Boycotts in Labor Disputes, 1938, 47 Yale Law J. 341; Gromfine, Labor's Use of Secondary Boycotts, 1947, 15 Geo. Washington Law Rev. 327.

■ When the term is read with the aid of the glossary provided by the law of secondary boycott it becomes quite clear that Project cannot claim to be a victim of that weapon in labor's arsenal. To suggest that Project had no interest in the dispute between Ebasco and its employees is to look at the form and remain blind to substance. In every meaningful sense it had made itself party to the contest. Manifestly it was not an innocent bystander, nor a neutral. It was firmly allied to Ebasco and it was its conduct as ally of Ebasco which directly provoked the union's action.

Significant is the unique character of the contract between Ebasco and Project. Ebasco did not buy any articles of commerce from Project. Ebasco did not retain the professional services of Project. Ebasco "bought" from Project, in the words of the basic contract, "services of your designers and draftsmen * * * to work under the direction and supervision of the Purchaser." The purchase price consisted of the actual wages paid by Project plus a factor for overhead and profit. In practice the terms and implications of the agreement were fully spelled out. Ebasco supplied both direction and supervision of a detailed and pervasive character. It established the maximum wage rates for which it would be charged. Invoices were in terms of man-hours, employee by employee. Daily tally was taken of the number of men at work on Ebasco assignments and communicated to Ebasco. The final product, the plans and drawings, were placed upon forms supplied by Ebasco, bearing its name, and were thus delivered to Ebasco's clients as Ebasco's work. In advertising its services to the industries which it served Ebasco held itself out as "having

available" a number of designers and draftsmen which included those employed by Project.

True enough, the contract prescribes that "all employees furnished by the seller shall at all times be and remain employees of the seller". I do not, however, draw therefrom the inference advocated by the petitioner and the charging party. The very need for such a provision emphasizes the realization of the parties that they were doing business on terms which cast a shadow of doubt upon the identity of the employer. Without question, Ebasco and Project were free to contract who, as between themselves, should be subject to the burden and possessed of the privileges that attach to the employer of those on Project's payroll. But the law is not foreclosed by such agreements to examine the reality relevant to the purposes of a particular statute. Cf. Rutherford Food Corp. v. McComb, 1947, 331 U.S. 722, 67 S.Ct. 1473; N.L.R.B. v. Hearst Publications, Inc., 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170.

I am unable to hold that corporate ownership or insulation of legal interests between two businesses can be conclusive as to neutrality or disinterestedness in a labor dispute.

The evidence is abundant that Project's employees did work, which, but for the strike of Ebasco's employees, would have been done by Ebasco. The economic effect upon Ebasco's employees was precisely that which would flow from Ebasco's hiring strikebreakers to work on its own premises. The conduct of the union in inducing Project's employees to strike is not different in kind from its conduct in inducing Ebasco's employees to strike. If the latter is not amenable to judicial restraint, neither is the former. In encouraging a strike at Project the union was not extending its activity to a front remote from the immediate dispute but to one intimately and indeed inextricably united to it. See Bakery Drivers Local v. Wohl, 1942, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178; cf. Carpenters Union v. Ritter's Cafe, 1942, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143.

The nexus between the labor dispute and the firm picketed in the instant case is immeasurably closer than in the Ritter case where the injunction against picketing was upheld, or in the Wohl case where it was condemned. It must be apparent that a construction of the Act which outlaws the kind of union activity here involved would almost certainly cast grave doubts upon its constitutionality. It is preferable to interpret the disputed section so as to restrain only that kind of union activity which does not enjoy constitutional immunity.

The case at bar is not an instance of a secondary boycott.

For these reasons it is clear that there has been no violation of Section 8(b) (4) (A) and the court is therefore without power to grant the requested relief.

Petitioner's evidence has tended to prove that the nature of the business relation between Project and Ebasco is common in this type of business—that it is not an unusual practice for one firm to purchase the services of another firms' employees, nor for the former to supply active supervision of the latter's employees so engaged. These facts do not affect my conclusion. All it can mean is that the practices in a particular industry may be such that the normal contractor-subcontractor relationship carries with it the label of "ally" in a labor dispute context. The decision in this case is not dispositive of subcontracting in other industries, nor do I indicate any opinion as to the application of the Act if the normal volume of subcontracting work in this case had not been increased by reason of the primary contractor's strike. For the same reasons the existence of a contract between Project and Ebasco antedating the strike is without legal significance.

Having reached these conclusions it becomes unnecessary to decide whether, in any event, Section 8(c) would be a bar to the granting of relief. "Sec. 8(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

I shall also forego discussion of other intriguing questions suggested in the able briefs presented by the petitioner, the respondent, the intervenor and the amici.

Petition denied.