**LOCAL NO. 24, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 14558.**

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 5, 1959.

Decided March 5, 1959.

———◆———

Mr. David Leo Uelmen, Milwaukee, Wis., of the bar of the Supreme Court of Wisconsin, pro hac vice, by special leave of court, for petitioners. Mr. Herbert S. Thatcher, Washington, D. C., was on the brief for petitioners. Mr. Donald M. Murtha, Washington, D. C., also entered an appearance for petitioners.

Mr. Melvin Pollack, Attorney, National Labor Relations Board, with whom Mr. Jerome D. Fenton, General Counsel, National Labor Relations Board, Mr. Thomas J. McDermott, Associate General Counsel, National Labor Relations Board, Mr. Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, and Mr. Frederick U. Reel, Attorney, National Labor Relations Board, were on the brief, for respondent.

Before PRETTYMAN, Chief Judge, and BAZELON and BURGER, Circuit Judges.

PRETTYMAN, Chief Judge.

This is a petition to review an order of the National Labor Relations Board and a cross-petition for enforcement of that order. An alleged secondary boycott by a labor organization is the subject matter.

A.C.E. Transportation Company, Inc. (called ACE in this litigation) is a motor carrier of freight. Its principal office and terminal are in Akron, Ohio, and it has terminals in several distant cities. The motor vehicle used consists of two parts, (1) a tractor, which is the motor and the driver's cab, and (2) the trailer, which contains the freight. ACE owns the trailers it uses. Of the approximately 250 tractors used, ACE owns 160. It leases the other 90 tractors from eleven lessors. Some of the tractors are driven by their owners on a full-time or part-time basis. At other times these trucks are driven by hired drivers. This controversy concerns the hired drivers.

ACE and our petitioner Local 24 [1] have a collective bargaining agreement, according to which the Union represents employee-drivers. That agreement is the same as the agreements which the Union has with other motor vehicle carriers. It contains an Article XXXII. Section 1 of that Article provides that *owner-operators* are not covered by the agreement unless they are affiliated by lease with a certificated carrier. Section 4 of the Article provides, in part: "In all cases, hired or leased equipment shall be operated by an employee of the certificated or permitted carrier." Apparently all parties contemplated that the entire agreement covered all drivers, those employed directly by ACE, those who drove their own equipment, and those who were hired to drive leased equipment.

A dispute arose as to whether Article XXXII of the agreement was valid in

---

1. The full name is Local No. 24, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

its application to owner-drivers. The Ohio courts held it not valid as thus applied, and enjoined all parties from giving effect to its provisions. Apparently the drivers and the Union considered that this decree struck down the sentence in Section 4, Article XXXII, which we have just quoted, and left those drivers without any agreement as to wages, working conditions, etc. Thereupon Local 24 requested recognition from the lessor-owners and sought agreements from them concerning terms and conditions of employment for the drivers of leased equipment. All the owners refused to meet these demands. Thereupon the drivers struck. In the course of the strike they picketed the ACE terminals at various cities, and in the course of the picketing the strikers directly induced employees of ACE to honor the picket line and to refrain from working. These actions on the part of the striking drivers are the subject matter of the present controversy.

The statutory provision here involved is Section 8(b) (4) (A) and (B) of the National Labor Relations Act,[2] the so-called secondary boycott provision of the statute. The precise question before us is whether the strikers, in the actions we have above described, violated this section of the statute.

We are met at the threshold with a question, not raised by the parties, as to whether Article XXXII of the bargained agreement covered non-owner drivers of leased equipment. In reversing the Ohio courts,[3] the Supreme Court of the United States said:[4] "The Article is in express terms made applicable only to a lessor-driver when he himself drives his vehicle in the business of the lessee-carrier." And the Court further said:[5]

> "This would necessarily be the case as the text of the Article, and that text as illumined by its history, conclusively establish that the regulations in no wise apply to the terms of lease of a vehicle when driven by a driver not the owner of the vehicle; the wages, hours and working conditions to be observed by contracting employers of non-owner drivers are governed by the general provisions in that regard found in other articles of the collective bargaining agreement."

If Article XXXII did not relate to the employment of non-owner drivers of the leased equipment, those drivers apparently were not affected by the decree of the Ohio courts; they have at all times had a valid agreement with ACE in Articles other than Article XXXII concerning the terms of their employment. If that be the posture of events, the strike would appear to have been without justification. Nevertheless under such circumstances the primary employer was ACE; the picketing of ACE terminals was picketing of the primary employer; and no

---

**2.** 61 Stat. 140 (1947), 29 U.S.C.A. § 158 (b) (4) (A) and (B):

"(b) It shall be an unfair labor practice for a labor organization or its agents—

" *  *  *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9; *  *  *."

**3.** Local 24 of the International Brotherhood of Teamsters etc. v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959).

**4.** Id., 358 U.S. at pages 286–287, 79 S.Ct. at page 300.

**5.** Id., 358 U.S. at page 293, 79 S.Ct. at page 303.

secondary boycott was involved in that picketing.

However that problem is not presented to us and we do not attempt to pass upon it. We will consider the case as it was considered by the Board and as it is presented to us. The trial examiner took the view that ACE, together with the lessors, is an employer of these drivers. In other words, his view was that the lessor-owners and ACE are co-employers. Upon that premise he concluded that the strikers had not engaged in a secondary boycott and had not violated Section 8(b) (4) (A) and (B). When the case came to the Board four members participated. Two joined in an opinion, a third concurred with a special opinion, and the fourth dissented. In their joint opinion the two members took the view that the lessor-owners were independent contractors in respect to ACE and that the lessor-owners were the only employers of the drivers. From that premise they concluded that ACE was a neutral in the dispute between the drivers and the lessor-owners and that therefore the picketing of the ACE terminals was a secondary boycott. The concurring member thought that the relationship between ACE and the drivers was analogous to that existing between a contractor and the employees of a sub-contractor and so found violation of the statute by the strikers. The dissenting member said he thought his co-members misconceived the issue. He believed the issue to be whether ACE stood in such relationship to the drivers of the leased equipment that it was entitled to the protection intended by Congress to be afforded to neutrals or persons "wholly unconcerned" with the primary dispute. Upon examination of the facts he concluded that, whether or not the owners of the equipment "retained sufficient indicia of the relationship to constitute themselves employers of the drivers of such equipment, it is certainly true that these owner-lessors have given over to a more-than-merely-substantial degree the indicia and exercise of the functions of an employer of these drivers to ACE."

He then considered Section 8(a) (3) of the statute, which applies to representation cases, and thought that in a representation case ACE would undoubtedly be held to be an employer of the drivers. His final conclusion was that ACE could not be regarded as a neutral or "wholly unconcerned" with a dispute concerning these drivers.

The facts concerning the relationship of ACE to these drivers and to the lessor-owners and concerning the relationship of the lessor-owners to the drivers are exceedingly complicated.

*ACE and the lessors.*

The lessors' tractors used in ACE's service are painted with ACE's colors, name, and certificate numbers and are used exclusively in ACE's service. ACE regularly inspects these tractors to insure first-class condition. The lessors haul freight solely through the authority given ACE by the Interstate Commerce Commission and the Ohio Public Utilities Commission. ACE pays the fees for such authority. The destination and route of each shipment are designated by ACE, although the drivers may take certain alternate routes. ACE provides insurance for property damage, public liability, and cargo loss. For damages to ACE's trailers while in transit, the lessors' liability is limited to $250 for each accident. Only the lessors or their competent employees may operate the tractors, and the lessors must render their agreed services in such manner as to promote the good will and reputation of ACE. The lessors pay all costs for operation, repair, licensing and regulation of the tractors. They provide workmen's compensation coverage for their drivers and all state and federal taxes for unemployment compensation insurance, Social Security, and old-age pensions. ACE is exempt from liability for fines or settlements assessed against the lessors or their employees resulting from violations of law or regulations by them.

Before a run a driver may apply to ACE for expected expenses during the trip, a procedure provided by the ACE-lessor agreement. The money given to

the driver is charged to the lessor's account. At the end of a trip a representative of the lessor marks on a form supplied by ACE the driver's gross pay, withholding taxes, Social Security tax, and unemployment compensation insurance payments. On presentation of this form ACE gives the driver its own check for his net pay. ACE also makes payments to the Teamsters welfare fund for each driver. All these payments are ultimately deducted by ACE from the amounts payable to the lessors.

All of the drivers in ACE's service, i. e., its own drivers and the lessors' drivers, are dispatched in rotation. When it is time for a lessor's driver to be used, ACE calls either the lessor or the lessor's driver. The dispatcher is an ACE employee.

*ACE and the drivers.*

In most matters ACE directs the conduct of the lessors' drivers as it would its own drivers. To enforce its directives it relies on its power to cancel its lease on a tractor driven by an offending driver. If a trucker asks ACE for employment and it has no job vacancies, he is referred to one of the lessors. Whether a trucker is referred by ACE or applies directly to a lessor, he is given a printed form supplied by ACE, with ACE's name at the top, it being the same form given to prospective employees of ACE. This form asks for a great deal of information, part of which is required by Interstate Commerce Commission regulations but much of which relates to other factors which would affect the driver's ability to promote ACE's business interests. The drivers are not told to answer only certain questions on the form. The drivers are examined by ACE's doctor. It is clear that the lessors hire only such drivers as appear acceptable to ACE.

All newly-hired drivers are given a "Drivers Manual". The foreword, by ACE's president, opens with the statement that the manual is intended to acquaint "all drivers" with ACE's rules, and it closes with this sentence: "You are charged with the knowledge of the rules and regulations contained in the manual and you are expected to abide by them." The manual contains a list of specific instructions on every phase of a driver's job. The general topics include such things as safety, emergency procedure, accident reports, keeping of records, handling of money, running schedules, load weights, and obedience to dispatchers. The booklet gives such warnings as: "[V]iolation of any of [four specified 'don'ts'] will result in your discharge." When "pulling heated trailers [drivers] will be responsible for load, and must check heater at regular intervals." "Over Loads Will Not Be Tolerated." A driver "will be responsible for claim" for damage or shortage in his load. "Violation of instructions, late arrivals, etc., must be reported to Akron [i. e., to ACE and by the ACE dispatcher] for disciplinary action." The last page of the manual has a perforated edge and reads as follows:

ACE Transportation Company, Inc.

I ............ have received and read all Rules and Regulations that appear in manual and hereby state that I am familiar with rules and will abide by rules set forth.

............................
Driver's signature

Witness:

The ACE director of personnel testified that some of the directives in the manual do not apply to the lessors' drivers. For the most part these non-applicable directives relate to the care and maintenance of the tractors or to such procedures as would interfere with the keeping of accounts between ACE and the lessors. The briefing session on the rules is shorter for lessors' drivers than for ACE's employees, but the former have not been told that some of the rules do not apply to them. Nor have they been told they do not have to sign and submit the last page of the manual. In fact, ACE keeps in its files many forms signed by lessors' drivers.

ACE maintains a highway patrol to note violations of its rules. Both the

drivers and the lessors are notified of violations. In the case of more serious violations ACE recommends particular penalties, including discharge. If a lessor refuses to follow the recommendations, ACE can cancel its lease.

It should be noted that, while ACE can exercise only indirect pressure on the lessors' hired drivers, its contract with the lessors, referring to these lessors when they drive, states: "The employer [ACE] expressly reserves the right to control the manner, means and details of, and by which, the owner-operator performs his services, as well as the ends to be accomplished." Thus it appears that ACE seeks to exercise the same control over the lessors when they drive as it does over its own employees. Its control over the operations of the lessors' drivers is maintained indirectly but equally effectively.

The answer to the problem before us cannot be reached by the use of any legalistic word or phrase, such as "co-employer", or "independent contractor", or even "ally". It cannot be solved by the strict application of the technicalities which adhere to such legal terms. The problem is, as dissenting member Bean put it, whether the facts and circumstances are such that the strikers violated the secondary boycott provision of the statute when they picketed the terminals of ACE and induced the employees of ACE to honor their picket lines.

It is our view that the relationships of ACE, these drivers, and the lessor-owners are so intertwined with respect to employment that ACE was not protected by the statute against the impact of a strike by the drivers against the lessor-owners. The many tiny strands of ACE control over these drivers cannot be extricated from the total fabric of mutual obligation. Those strands are clearly part of the pattern of the employer-employee relationship.

As we pointed out in Seafarers International Union, etc. v. N. L. R. B.,[6] this section (8(b) (4) (A) and (B)) cannot be read or applied literally; it must be construed. Of course, in an area so wide as is the field of labor relations, there are many situations in which the answer to a dispute under this section is easily derived by the application of such legalistic formulæ as "independent contractors", "co-employers", or "allies". But it is equally clear that there is a zone of dispute in which such formulæ are useless, and the answer must be derived by applying the intent of the statute to the facts in the case. This is such a case. We need not devise a new word to describe the relationship here depicted. We think the Board erred in limiting itself to the meaning of the legal term "independent contractor".

To state the matter otherwise, we agree with the contentions of our petitioners as the trial examiner described them. He said:

"Rather, the Respondents [our petitioners] say, the businesses of the Lessors and ACE are so integrated operationally that for purposes of this proceeding they must be deemed either a single employer, a joint or common venture, a 'straight line' operation within the Board's understanding of that term, or an alliance of interest. The Respondents maintain that whichever term may best be used to describe the relationship among ACE and the Lessors, their business arrangements are such that in the Union's dispute with the Lessors or any one of them neither ACE nor any of the Lessors is so unconcerned therewith that it is statutorily shielded as a neutral from an extension of the dispute by the Union to its operations, and, therefore, the Union's picketing and inducement herein occurred at premises which in this proceeding should be regarded as primary and not secondary."

It is our conclusion that in picketing the ACE terminals and in inducing ACE employees to honor the picket line the

6. 105 U.S.App.D.C. —, 265 F.2d 585 (1959).

strikers did not violate the secondary boycott provision of the statute. Accordingly the order of the Board must be set aside. The cross-petition for enforcement will be denied.

So ordered.