CARPET, LINOLEUM, SOFT TILE AND RESILIENT FLOOR COVERING LAYERS, LOCAL UNION NO. 419, AFL-CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Sears, Roebuck and Company, Intervenor.

No. 23223.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1970.

Decided June 12, 1970.

748

Mr. William B. Peer, Washington, D. C., for petitioner. Mr. David S. Barr, Washington, D. C., was on the brief for petitioner.

Mr. Baruch A. Fellner, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, were on the brief, for respondent.

Mr. Kalvin M. Grove, Northbrook, Ill., for intervenor.

Before FAHY, Senior Circuit Judge, and ROBINSON and MacKINNON, Circuit Judges.

FAHY, Senior Circuit Judge:

The Union[1] petitions the court to review an order of the National Labor Relations Board finding that the Union violated Section 8(b)(4)(i) and (ii) (B),[2] the secondary boycott provision, of the National Labor Relations Act. The Board filed a cross-application for enforcement of its order. The charge leading to this order grew out of Union picketing of intervenor Sears, Roebuck and Co. in the Denver, Colorado area, allegedly "with an unlawful object of forcing Sears to cease doing business with" certain installers of floor covering. The Board found that the picketing grew out of a dispute with the installers. The Union's position is that the dispute resulting in the picketing also involved Sears, with respect to the wages, hours and working conditions Sears has with the installers of carpeting or floor covering. For reasons to be stated we modify the Board's order as hereinafter provided and remand the case for further consideration by the Board.

The relationship between Sears and the installers grows out of Sears' sale of carpeting or floor covering to its customers. If the customer desires a complete job with installation service Sears will prepare an Estimate and Proposal giving both the price of the carpeting or covering and estimated installation charges. Should the customer accept the Estimate and Proposal the Sears salesman draws a diagram—in a place available on the form—of the space to be covered. If agreed to the Estimate and Proposal is signed in multiple copies. The reverse side of the form contains a statement that Sears will not make the installation but is authorized to arrange for it with someone licensed to do this type of work. By signing the form the customer also authorizes Sears (1) to issue to the installer a work order, (2) to inspect the installation upon its completion, and (3) to pay the installer his charges when the installation has been completed satisfactorily. The customer agrees to pay Sears the total amount specified, which covers the price of the

1. The full name of the Union, petitioner, is as follows: Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL–CIO.

2. 29 U.S.C. § 158(b)(4)(B) provides: (b) It shall be an unfair labor practice for a labor organization * * * (4) (i) to engage in, or to induce or encourage any individual employed by any person * * * to engage in, a strike or a refusal * * * to perform any serv-ices; or (ii) to threaten, coerce, or restrain any person * * * where in either case an object thereof is— * * * * * * (B) forcing or requiring any person to * * * cease doing business with any other person * * * *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

material and the installation charges.[3] Sears has what the Trial Examiner characterized as a "working relationship" with some sixty installers, each of whom has at one of Sears' warehouses a pigeon-hole in which the installer's particular job orders are placed, or other suitable substitute arrangements are made. The installers pick up the orders assigned to them, respectively, procure the material required for the job on any given day, and do the installation. On completion they submit to Sears one of the copies of the Estimate and Proposal together with an invoice form for payment.

The installers are business concerns both individually conducted and in the form of partnerships. One of them is Joe and Eddie's Carpet Service Company. The dispute surfaced when the Union asked the individuals Joe and Eddie to join the Union. Upon receiving a negative response Joe and Eddie's was picketed for a short time at the residence of one of its customers, followed some days later by the picketing of Sears,[4] which caused some interruptions of Sears' business. Thus arose the case before the Board.

The question is whether the Board, agreeing with the Trial Examiner, correctly determined that Sears was a neutral secondary employer in the dispute, the primary employer being the nonunion installers, with the Union exerting pressure upon Sears with an object of causing it to "cease doing business" with the installers, thus violating the secondary boycott provisions of the Act.

Both Trial Examiner and Board in detail reviewed the relationship between Sears and the installers bearing on the question whether the latter were employees of the former, and concluded they were not, that they were independent contractors. This conclusion was based on findings which have substantial support in the evidence, and is accepted by this court. This does not, however, lead to approval of the order, for there remains the question whether, nevertheless, Sears was neutral in the dispute.

On this question the Board in its decision stated only that "there is no basis for finding Sears to be an 'ally' of the contractors in their dispute with" the Union, and "Sears is not sufficiently related to the contractors to destroy its neutrality." The Board decision also adopts, however, the findings, conclusions, and recommendations of the Trial Examiner. After reaching his finding the installers were not employees, centering largely upon the absence in Sears of "right to control," the Trial Examiner treats the issue of Sears' neutrality as follows:

> [N]othing within the record would warrant a determination that Sears claims any power or right to determine labor relations policy for or with these floor covering installation contractors. Necessarily, therefore, Respondent Union's grievance could only be resolved by them, not by Complainant herein; I so find. Under no circumstances can these floor covering firms be considered "allies" with respect to Sears, concerning a dispute which the latter firm could resolve. Nor can the reverse be considered

3. There are variations depending upon whether transaction is on credit or not and the type of coverings. The time of installation is mutually arranged between the customer and Sears.

4. The picket signs, front and reverse, read as follows:

| Front | Reverse |
|---|---|
| Floor Covering Sold By | Notice |
| Sears Roebuck And Co. | For Top Quality |
| Is Installed By | Work Patronize |
| Underpaid Workers | Firms Employing |
| Carpet & Linoleum Layers | Union Carpet |
| Local # 419 | & Linoleum Layers |

true. Respondent Union's contrary contention must be rejected.[5]

We must read into the Board's sketchy reference to this phase of the case its adoption of the fuller views of the Trial Examiner as outlined above.

From the foregoing it appears that once it was determined the installers were independent contractors, the principal reason for deciding the picketing amounted to a secondary boycott was that the dispute of the Union was with the installers and could not be resolved by Sears. Assuming the independent contractor status of the installers and that the Union's original objective was to organize them, we think the decision that Sears was a neutral is not adequately reached in the reasons given by the Board.

The elusive boundaries[6] between primary picketing protected by the Act and illegal secondary activities have given rise to such concepts as the one referred to as the ally doctrine. But this court has recognized, in Local No. 24, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. NLRB, 105 U.S.App.D.C. 271, 276, 266 F.2d 675, 680 (1959), that "the answer must be derived by applying the intent of the statute to the facts in the case."[7] The consideration we give to the ally doctrine accordingly is to aid our understanding of what the statute is intended to prohibit.

Section 8(b)(4)(B) makes no reference to a "neutral employer." The term derives from the remarks of Senator Taft, sponsor of the provision, describing its purpose:

This provision makes it unlawful to resort to a secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees.[8]

The proscription of the sweeping terms of the provision was thus construed to be "limited to protecting employers in the position of neutrals between contending parties." National Woodwork Manufacturers v. NLRB, 386 U.S. 612, 625, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).[9]

---

5. The Trial Examiner had also held that: [S]ince Sears' concern, with respect to their work, is limited merely to such work's final result, Complainant's [Sears'] business relationship with them cannot be considered sufficiently close to destroy its neutrality. Complainant's [Sears'] counsel, within his brief, suggests—in this connection—that:—

It is important in analyzing this record to understand that the installation of floor covering is not an integrated part of our business and in arranging for the installation Sears has not delegated the function normally performed, nor ever performed, by regular Sears employees; the customer is expressly told that Sears will not do the installation. * * * In our situation the fact that Sears will find an installer for the customer is merely an aid in selling the merchandise; Sears has not replaced an integrated employee operation with an outside contractor.

These factual contentions, within my view, have record support; I concur.

6. As recently recognized by the Supreme Court in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 386–387, 89 S.Ct. 1109, 22 L. Ed.2d 344 (1969):

[T]he common law of labor relations has created no concept more elusive than that of "secondary" conduct; it has drawn no lines more arbitrary, tenuous, and shifting than those separating "primary" from "secondary" activities.

7. See National Maritime Union of America v. NLRB, 342 F.2d 538, 542 (2d Cir.), cert. denied, 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 78 (1965).

8. 93 Cong.Rec. 4198, II Legislative History of the Labor-Management Relations Act 1106 (1947). Another frequently cited definition of a secondary boycott is that of Judge Learned Hand in International Bhd. of Elec. Workers, Local 501 v. NLRB, 181 F.2d 34, 37 (2d Cir. 1950), aff'd, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951):

The gravemen [sic] of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it.

9. In tracing the history of the legislation the Court noted an adherence to the "core

Sears does not appear to be a neutral in an economic sense.[10] The record suggests that Sears has a direct interest in whether the installers are unionized or not, for the operations of the two involved in this case appear to be very substantially integrated. Sears sells installed carpeting, not uninstalled carpeting with an outlet to independent contractors.[11] The company not only makes a profit from the process of installation— it charges the customer what it pays the installers plus a markup—but the customer pays Sears for an installed carpet.[12] Thus an important economic interest of Sears in the dispute of the Union is that to the extent Sears' carpeting is installed by non-unionized workers willing to perform services on an assigned, piecework basis instead of an hourly rate, Sears may gain a competitive advantage in the carpeting market in Denver.[13] While the Board examined the economic relationship between Sears and the installers,[14] its inquiry focused unduly in this respect upon whether the installers were employees or independent contractors.

Assuming that Sears has this economic stake in the dispute, does it follow that Sears is not a neutral? We do not think NLRB v. Denver Bldg. & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), relied upon by Sears, resolves the question. There the picketing was at a construction site common to the prime contractor and a subcontractor with which the Union had a dispute, but the relations between the contractors were not integrated in the manner that distinguishes Sears' relation with the several installers as Sears' carpet customers continue to come along. Moreover, the *Denver* case did not involve an economic dependence of the subcontractor upon the prime contractor such as the installers' dependence upon their arrangements with Sears.

It is not clear that Sears and the installers are "merely doing business" with each other, as NLRB v. Milk Drivers & Dairy Employees Local No. 584, 341

concept" of a secondary boycott: "Union pressure directed at a neutral employer the object of which was to induce or coerce him to cease doing business with an employer with whom the union was engaged in a labor dispute." 386 U.S. at 622, 87 S.Ct. at 1256–1257.

10. It is on this basis that the Union apparently rests its case, rather than on the ally doctrine. In doing so the Union's position finds support in the denial by the District Court of the Regional Director's request for an injunction under § 10(*l*), 29 U.S.C. § 160(*l*). Waers v. Carpet Layers Local 419, No. C–1052 (D.Col. September 27, 1968) (unreported). *See*, Sears, Roebuck & Co. v. Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, 410 F.2d 1148 (10th Cir. 1969), vacated, 397 U.S. 655, 90 S.Ct. 1299, 25 L.Ed.2d 637 (1970).

11. The Trial Examiner noted that:
In connection with Sears' general mercantile operations, the firm sells floor covering at retail. * * * In most cases, the firm sells not only the floor covering materials but likewise, whatever installation services may be required. The customer pays a single price, calculated to cover Sears' selling price for necessary materials purchased together with a labor selling price, plus any charges related to credit terms which the particular customer may request or require.

12. Sears, of course, looks to the installers to correct their defective work, and, as noted by the Trial Examiner, the customer could complain directly to the installers.

13. There was evidence that Sears negotiated a reduction in the per square yard rate it pays its carpet installers from $1.55 to $1.35, with the result of increasing Sears' profit by 20¢ per square yard. According to a representative of Sears, this was done to "bring our price down to the customer."

14. In addition to the above matters, there was testimony concerning the control Sears has over the profits of the installers through the conceded absence of any obligation on its part to assign work, as opposed to the contractual obligation of the installers to accept work they could satisfactorily perform and not to perform work other than that of Sears. There was other testimony that some of the contractual obligations were not adhered to by the installers.

F.2d 29, 32 (2d Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 39, 15 L.Ed.2d 64 (1965) construed to be the relation of the two independent contractors in the *Denver* case. The fundamental problem is whether this is the true situation between Sears and the installers.[15] While the record supports the finding that the Union's original dispute was with the installers known as Joe and Eddie's the record also suggests that the Union's activities formed part of a dispute which may justifiably have been enlarged to include Sears because of its relationship with the installers—that the Union need not confine its protest to the places of business of the installers. That they were independent contractors would not alone prevent Sears, both because of its influence over the relationship and the place of the installers in its over-all financial operations, from having an interest in a dispute designed to alter the relationship, similar to that it would have in a dispute involving its own employees.

The secondary boycott provisions were designed to protect a business relationship between a neutral secondary employer and a primary employer who has an independent dispute with a union. It is questionable whether they were meant to prevent a union from bringing its sanctions to bear on a party to a business relationship which is the very object of the dispute.

 Our questioning finds encouragement in the ally doctrine, early engrafted upon the law of secondary boycotts. The Board and the courts have used the term "ally" to include a relationship between two employers engaged in a single economic enterprise of such kind that one may not be considered a neutral in the disputes of the other.[16] *See,* National Union of Marine Cooks (Irwin-Lyons Lumber Co.), 87 NLRB 54 (1949); Sheet Metal Workers Int'l Ass'n, Local Union No. 223, AFL–CIO v. Atlas, 384 F.2d 101 (5th Cir. 1967); J. G. Roy & Sons v. NLRB, 251 F.2d 771 (1st Cir. 1958); Miami Newspaper Pressmen's Local No. 46 v. NLRB, 116 U.S.App.D.C. 192, 322 F.2d 405 (1963); San Francisco-Oakland Newspaper Guild v. Kennedy, 412 F.2d 541 (9th Cir. 1969). Various criteria of a single economic enterprise, such as common ownership and control, overlapping of management functions, and common control over labor policies, as well as integration of business operations, help to determine whether there is in legal contemplation a "single employer." By adopting the decision of the Trial Examiner, the Board appears to have found the "ally" cases inapplicable because Sears was not legally capable of resolving the dispute. To rephrase the Board's position as we understand it, the Board would interpret the phrase "control over labor policies," one of the criteria of a "single employer," to mean control over whether a union is to be recognized, or direct employer control over such fundamental employment factors as wages and working conditions. To accept this view would be to render the finding that the installers here were independent contractors dispositive, a result this court heretofore has not attributed to an independent contractor status.

In Local No. 24, Int'l Bhd. of Teamsters, *supra,* ACE Transportation Co., a motor carrier, owned some motor cabs and hired drivers of its own, but it also contracted with others for the lease of cabs together with drivers employed by the lessor-owners. The union had a recognitional dispute with the owners of

15. It has been suggested that *Denver* has been modified by Local 761, International Union of Electrical, Radio and Machine Workers AFL–CIO v. NLRB, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961), at least to the extent that *Denver* did not examine the degree to which the operations of the secondary employer relate to those of the primary employer. *See,* Markwell & Hartz, Inc. v. NLRB, 387 F.2d 79, 89 (5th Cir. 1967) (dissent by Judge Wisdom). We do not, however, consider the validity of an assumption to that effect to be necessary to the resolution of the present case.

16. The ally doctrine, however, originated in another context, the relevance of which is discussed *infra.*

the leased equipment and their drivers. In the course of the dispute the union picketed ACE, causing its employees to strike. The Board found that the lessors were independent contractors and that the picketing of ACE was a secondary boycott.[17] The court disagreed. Reviewing the close relationship between ACE and the drivers hired by the lessor-owners, we commented:

> It is our view that the relationships of ACE, these drivers, and the lessor-owners are so intertwined with respect to employment that ACE was not protected by the statute against the impact of a strike by the drivers against the lessor-owners. The many tiny strands of ACE control over these drivers cannot be extricated from the total fabric of mutual obligation. Those strands are clearly part of the pattern of the employer-employee relationship.

105 U.S.App.D.C. at 276, 266 F.2d at 680.

While this court did not purport to apply the ally doctrine in the *Teamsters* case, its analysis of the scope of the secondary boycott provisions amounted to the same thing. It was this practical approach to the statute which was the basis of the original ally doctrine as formulated in Douds v. Metropolitan Federation of Architects, 75 F.Supp. 672 (S.D. N.Y.1948). There a union had a dispute with Ebasco, an architectural firm, and a strike against Ebasco resulted. The struck firm then contracted with another independent firm called Project to perform the work of its striking employees. Realizing this, the union picketed Project, causing Project to claim that the union was engaging in a secondary boycott. The court did not dispute that Ebasco was "doing business" with Project, but, it remarked, the same can be said to be the case between Ebasco and its own employees, or between a primary employer and a professional supplier of strikebreakers. "[U]nable to hold that corporate ownership or insulation of legal interests between two businesses can be conclusive as to neutrality or disinterestedness in a labor dispute," (75 F. Supp. at 677) the court turned to the policy of the Act and commented:

> To suggest that Project had no interest in the dispute between Ebasco and is employees is to look at the form and remain blind to substance. In every meaningful sense it had made itself party to the contest. Manifestly it was not an innocent bystander, nor a neutral. It was firmly allied to Ebasco and it was its conduct as ally of Ebasco which directly provoked the union's action.

75 F.Supp. at 676. The court thus permitted a union to bring its economic sanctions to bear upon another employer when to do so would not be "extending its activity to a front remote from the immediate dispute but to one intimately and indeed inextricably united to it." 75 F. Supp. at 677.

■ The relationship which has caused an employer to lose his neutrality un-

17. The Board's position, more fully developed than here, was as follows:

Section 8(b)(4)(A) was to eliminate strikes, or the inducement thereof, aimed at employers who were "wholly unconcerned in the disagreement" between a union and another employer. The illustrations used by the proponents of the bill disclose that by an "unconcerned" employer, Congress meant an employer who is not involved in a labor dispute with *his* immediate employees over such matters as union recognition or particular economic issues directly affecting the terms and conditions of employment of his own employees. Strike action directed against an employer who is not in a position *legally* to grant the union's organizational or economic demands, i. e., a neutral or "secondary" employer, is clearly forbidden by the purpose as well as by the language of Section 8(b)(4)(A) and (B). By this test, ACE was a "neutral" and "secondary" employer: ACE had no dispute with its own employees and could not legally compel each of the Lessors to recognize Local No. 24 as the representative of their employees or recognize Local No. 24 as the representative of employees of each of the Lessors. [Emphasis original.]
120 NLRB 1103, 1108–09 (1958).

der the Ebasco case and those following it, *see, e.g.*, NLRB v. Business Machine & Office Appliance Mechanics, 228 F.2d 553 (2d Cir. 1955), cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956); Truck Drivers Union Local No. 413, International Brotherhood of Teamsters, Chauffeurs Warehousemen and Helpers of America v. NLRB, 118 U.S. App.D.C. 149, 334 F.2d 539, cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); *cf.* National Woodwork Manufacturers v. NLRB, *supra*, thus has been recognized in the performance of struck work which has been farmed out to frustrate the effects of a strike.[18] While the relationship in the present case is different, nevertheless the principle which emerges from Ebasco—that an employer may not be insulated from union activities designed to affect a business relationship which itself forms part of the dispute—calls for Board consideration of its application to the present case. For in this case, as in *Teamsters*, the relationship between Sears and the installers might so resemble that of employer and employee that a labor dispute with the installers could justifiably include Sears. We are, however, unwilling, in view of the Board's primary responsibility, to decide the issue without further consideration by the Board.

 We accordingly remand the case to the Board for a re-examination of the question of Sears' neutrality. While we support the findings of the Board that the installers are not employees of Sears, they stand in such a business relationship with Sears as to require further consideration and explication by the Board of whether the Union's effort to unionize the installers grows out of the same kind of a relationship as would justify a union in picketing to obtain unionization of employees of a primary employer. If this is the case, Sears cannot be protected as a neutral.

The Order is enforced in its present terms pending reconsideration of the case by the Board, being thus modified as to its duration. Such order as eventuates upon reconsideration shall have the status of a Board Order subject to judicial review.

---

18. The conference report to the 1959 amendments to the secondary boycott provisions cited the *Ebasco* and *Business Machine* cases in explaining that "no language has been included with reference to struck work because the committee of conference did not wish to change existing law" in that respect. Conf.Rep. No. 1147, 86th Cong., 1st Sess. 38 (1959), U.S.Code Cong. & Admin.News 1959, p. 2510, I Legislative History of the Labor-Management Reporting and Disclosure Act, 942.

Moreover, in enacting the secondary boycott provisions in 1947, and in amending them in 1959, the inapplicability of the provisions to two employers allied in a single economic enterprise was not overlooked. *See*, 105 Cong.Rec. 15848–49. II Legislative History, *supra*, 1680–81; Miami Newspaper, *supra*, 116 U.S.App. D.C. at 196, 322 F.2d at 409.