MARRIOTT IN–FLITE SERVICES, A Division of Marriott Corporation, Plaintiff,

v.

LOCAL 504, AIR TRANSPORT DIVISION, TRANSPORT WORKERS OF AMERICA, AFL–CIO, Defendant.

No. 73 C 1380.

United States District Court, E. D. New York.

Nov. 22, 1978.

---

**536**

Jackson, Lewis, Schnitzler & Krupman, New York City by James R. Williams, New York City, for plaintiff.

Wallace & O'Haire, Hicksville, N. Y. by Andrew J. Wallace, Hicksville, N. Y., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

SIFTON, District Judge.

Plaintiff, Marriott In-Flite Services, A Division of Marriott Corporation ("Marriott") instituted this action pursuant to § 303 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. §§ 151, 187 ("LMRA").

Plaintiff's complaint alleges that the defendant union violated Sections 8(b)(4)(i), (ii)(B) and 187(a) of the Act by unlawfully threatening and coercing plaintiff Marriott and other persons with the intent of forcing Marriott to cease doing business with KLM Royal Dutch Airlines ("KLM"), an employer which was at the time engaged in a labor dispute with defendant union.

The defendant union, Local 504, in its answer denied the material allegations of

the complaint. It admitted that some of its members picketed the KLM facility, but denied any wrongdoing on the part of its members. Subsequently, after the filing of its original answer the defendant, with leave of the Court, filed an affirmative defense based on the so-called "ally doctrine". Prior to trial the defendant moved for summary judgment based on this theory. This motion was denied because the Court found that whether Marriott was an "ally" of KLM in this dispute involved disputed questions of fact.

The case was tried before the Court without a jury. The Court, having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties and being otherwise fully advised, hereby makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. Plaintiff Marriott is a corporation organized and existing under the laws of the State of Delaware. It is duly authorized to conduct, and at least since June 1, 1973, has done business in the State of New York. Plaintiff operates a food catering service that provides in-flight meals for commercial airlines operating from the John F. Kennedy and LaGuardia Airport Terminals located within the jurisdiction of this Court.

2. KLM is, and has been since November 1, 1970, a foreign corporation doing business in the State of New York. In particular, it engaged in the air transportation of passengers and cargo to and from John F. Kennedy International Airport ("JFK").

3. Defendant, Local 504, is a Local of the Transport Workers Union of America, AFL–CIO ("TWU"). There was a labor agreement in effect for the period of November 1, 1970 to October 31, 1972 between KLM and TWU on behalf of Local 504. This agreement covered a number of KLM's employees at JFK including those employees who worked at KLM's in-flight catering commissary at 145th Drive and 167th Avenue.

4. Negotiations for a new agreement took place in the Fall of 1972. A key issue, which could not be resolved during these negotiations, was KLM's stated intention permanently to terminate the operations of its commissary at the close of business on October 31, 1972. However, similar statements had been made by KLM numerous times in the past in connection with prior labor negotiations and the statement was regarded by the union as subject to change depending on the outcome of the negotiations.

5. Unable to resolve the differences between them, the parties submitted their dispute to the National Mediation Board, pursuant to applicable law.[1] While attempts at mediation were continuing, KLM did not close its commissary and the union refrained from striking.[2] This *status quo* was maintained through the end of June, 1973.

6. On May 31, 1973, the National Mediation Board advised KLM and the union of its inability to resolve the dispute over the proposed closing of the commissary and that the parties would be free to pursue self-help remedies at the end of June. Shortly thereafter, Marriott contracted with KLM to provide food services for KLM's flights from JFK. KLM transferred its leasehold interest in the commissary facility to Marriott by assignment effective July 15, 1973. The commissary was not actually used by Marriott to service KLM flights until after the strike at issue herein was settled.

7. Pursuant to authority which was given to its Negotiating Committee at an Executive Board meeting in May, 1973 and with the authorization of TWU, the defendant Local struck KLM on July 1, 1973. From July 1, 1973 to September 6, 1973 the

---

1. Air Carriers Labor Act of 1936, as amended, 45 U.S.C. §§ 181, et seq.; Railway Labor Act of 1926, as amended, 45 U.S.C. §§ 151, et seq.

2. The Local's membership authorized a strike against KLM on October 27, 1972.

commissary and other KLM buildings were picketed by members of Local 504. The picketing at the commissary, which was conducted sporadically, was organized by a picketing committee whose members included the witnesses Cavallo and Nantel and Shop Steward Hernandez. The strike ended on September 6, 1973.

8. At the time of the strike an unresolved dispute existed between KLM and Local 504 with respect to continued operation by KLM of the commissary and the future of commissary employees.

9. During the strike Local members became aware that Marriott was doing commissary work for KLM; that is, Marriott was servicing KLM flights with catered foods. In the view of the union this represented an effort on the part of Marriott to perform struck work previously performed by members of the Local, which effort was viewed as not being of permanent duration and likely to cease once a satisfactory resolution of the labor dispute with KLM was arrived at.

10. As noted above, KLM had threatened to close the commissary on numerous occasions in the past. Although, even as perceived by the union, KLM went farther in the direction of closing down the commissary on this occasion than it had in the past (for example, sending out registered notices to the commissary employees that they were being terminated), the Local members still believed at the time the picketing was being conducted, that KLM could be convinced to resume commissary operations so that the commissary employees would get their jobs back.

11. During the course of the picketing of the commissary, trucks of third parties, whose drivers would not cross the picket lines, turned away. During the course of the picketing, a number of windows in the commissary building were broken. At least one Marriott vehicle was destroyed. These acts of vandalism were not authorized by or ratified by Local 504.

12. Plaintiff Marriott was aware of the dispute between KLM and Local 504 over commissary operations at the time Marriott contracted to do the commissary work for KLM.

13. In entering the commissary building to maintain and clean it, Marriott employees performed commissary work formerly done by members of Local 504.

14. Local 504 members did not picket any Marriott facilities other than the commissary building although there were a number of other larger Marriott facilities which could have been picketed. The commissary building was the site where Local members had worked and where they expected to return to work.

15. Although the lease for the commissary was transferred to Marriott in July, 1973, the building was not in any way physically identified as a Marriott facility.

16. The union was not informed that the lease on the commissary building was transferred from KLM to Marriott, nor were they ever informed that a contract existed between Marriott and KLM to provide food service on a continuing basis.

## CONCLUSIONS OF LAW

1. In order for plaintiff to prevail on its damages claim under § 303 it must establish that the defendant union was engaged in an unfair labor practice. Plaintiff alleges that defendant's picketing of the commissary building violated Section 8(b)(4)(i) of the LMRA, the so-called "secondary boycott" provision since it had as its object the cessation of business between KLM and Marriott. This Court finds that defendant, Local 504, did not violate Section 8(b)(4)(i) of the LMRA, 29 U.S.C. § 151 et seq. for two reasons: (1) Marriott was not believed by the defendant union to be "doing business" with KLM in the sense that the term is used in the LMRA; and (2) the union engaged in only primary picketing. The LMRA, 29 U.S.C. § 158, provides in part that:

(b) It shall be an unfair labor practice for a labor organization or its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in

an industry affecting commerce to engage in, a strike or a refusal in the course of his employment, to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing. (Emphasis added.)

■ The meaning of "doing business" in this provision was clarified by Judge Rifkind in the *Ebasco* case, *Douds v. Metropolitan Federation of Architects,* 75 F.Supp. 672, 675–76 (S.D.N.Y.1948), in a well-reasoned opinion subsequently adopted by the Second Circuit in *NLRB v. Business Machines & Office Appliance Mechanics, etc.,* 228 F.2d 533, *cert. denied,* 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956) and recognized by the Supreme Court in *National Woodwork Manufacturing Association v. NLRB,* 386 U.S. 612, 627, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). As Judge Rifkind pointed out, the legislative history of the statute makes clear that the provision was meant to protect business dealings with third parties who were "wholly unconcerned in the disagreement between an employer and his employees." 93 Cong.Rec. 4323 (April 29, 1947) (Remarks of Sen. Pepper), *quoted in,* 75 F.Supp. at 676. In the *Ebasco* case Judge Rifkind held that an employer who was doing work which prior to the labor dispute had been done by the striking employees was not a neutral but an ally of the primary employer. 75 F.Supp. at 676–77. Such an ally was not "doing business" with the primary employer in the sense necessary to receive the protection of the Act. In the present case Marriott was not, in fact, an innocent bystander in the dispute between KLM and Local 504. Moreover, it certainly did not appear to be an innocent bystander in the eyes of the defendant union. By undertaking to do the commissary work which was the subject of a continuing dispute between KLM and Local 504, Marriott reasonably appeared to any observer to have entangled "[it]self in the vortex of the primary dispute", *National Woodwork Manufacturers v. NLRB,* 386 U.S. 612, 627, 87 S.Ct. 1250, 1259, 18 L.Ed.2d 357 (1967) between KLM and Local 504.

Despite KLM's alleged intention permanently to terminate the commissary, the union reasonably viewed this intention as a bargaining ploy and, thus, in entire good faith viewed Marriott as performing "struck work" which would be performed once again by Local 504 members at the end of the strike. See, *Kable Printing Co. v. NLRB,* 545 F.2d 1079, 1084–1086 (7th Cir. 1976). The union properly viewed Marriott not as a neutral "doing business" with KLM, but as an ally of KLM. Since Marriott failed to take any steps to clarify the situation by revealing to the union the contract or lease assignments or by placing new signs on the building or otherwise, it can hardly complain about the union's good faith belief that it was picketing a premises which had been in the past and which they hoped would be in the future a work place for union employees.

■ *2. Primary Picketing.* The 1959 amendments to Section 8(b) made explicit what had previously been implicit: that the 8(b)(4)(B) ban on secondary boycotts was not intended to prohibit primary picketing. See 29 U.S.C. § 158(b)(4)(B), quoted *supra.* In the present case Local 504 did not picket Marriott facilities at JFK from which Mar-

riott was servicing KLM flights. They picketed only KLM facilities and the commissary building, which prior to the strike had been under lease to KLM but which, unbeknownst to the union, had been assigned to Marriott during the course of the strike.

Marriott portrays Local 504's continued picketing of the commissary as a secondary boycott designed to coerce Marriott into ceasing doing business with KLM. However, Local 504 did not picket any facilities which they knew to be Marriott facilities. Although the occasional presence of Marriott vehicles and personnel in the vicinity of the commissary might indicate Marriott's possible future interest in the facility, the union had no knowledge that Marriott held the lease on the building and no Marriott signs or other identification were placed on the building. The KLM commissary workers picketed not Marriott, but KLM. The commissary building was the site at which these workers had been employed until the date the strike began and where they intended to return to work when the strike ended.

Whatever the propriety of some of the conduct of individual members of Local 504, it is clear that the union activity complained of did not constitute an unfair labor practice. Plaintiff's suit for damages under § 303 of the LMRA is, therefore, dismissed. Plaintiff's state law claims were withdrawn at the conclusion of the taking of evidence.

Accordingly, the Clerk is directed to enter judgment in accordance with this opinion in favor of defendant and is further directed to mail a copy of this memorandum decision to counsel for all parties.

SO ORDERED.